**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **NO. 3:18-cr-00075-1** |
| | ) | |
| **CHRISTOPHER BECKHAM,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

Before the Court are Beckham's Motion to Dismiss and Motion to Suppress (Doc. Nos. 52, 53). Beckham moves to dismiss the indictment because it is procedurally improper and does not support federal jurisdiction under the Commerce Clause of the United States Constitution. He moves to suppress statements made to federal investigators without legal counsel. The Government opposes both motions. (Doc. Nos. 59, 60.) The parties have filed supporting exhibits, supplemental briefing, and additional authority. (Doc. Nos. 52-1 to 52-4, 53-1, 53-2, 60-1, 64-1, 65-1, 65-2, 86, 86-1, 87, 87-1, 88, 91, 107, 107-1, 112, 123, 127, 130, 131.) For the following reasons, the motions will be denied.

I.      The Indictment

The Indictment alleges that, on October 24, 2017, Beckham willfully caused bodily injury to A.A. by threatening him with a knife that traveled in interstate commerce. Beckham did so because he believed that A.A. and his daughters A.H. and F.H. were Muslim and not of American nationality. (Doc. No. 3 at 1.) Beckham said "Allahu Akbar" and "go back to your country" to the girls, who were wearing hijabs. (Id.) He then threatened A.A. by swinging a knife and punching at him. (Id.) He called all three family members "Iranis" and "ni---rs." (Id.)

The Indictment further alleges that during a March 12, 2018 interview with Federal Bureau of Investigation ("FBI") agents, without his state attorney (Doc. No. 86-1), Beckham made false statements, including that he saw A.H. and F.H. trying to break into cars, he heard them yell "Allahu Akbar," and they hit him on the back of the head. (Doc. No. 3 at 2.)

The grand jury charged Beckham with (1) assaulting A.A. with a dangerous weapon that traveled in interstate commerce, in violation of the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act ("HCPA"), 18 U.S.C. § 249(a)(2), and (2) knowingly and willfully making materially false statements and representations to the FBI, in violation of 18 U.S.C. § 1001. (Doc. No. 3 at 1-2.)

II.     Motion to Dismiss

        A.     Legal Standards

"A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b). Grounds for challenging "a defect in [an] indictment or information" include "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B). Generally, motions are capable of determination before trial if they raise questions of law rather than fact. United States v. Jones, 542 F.2d 661, 665 (6th Cir. 1976). On a motion to dismiss, "the [c]ourt must view the [i]ndictment's factual allegations as true[.]" United States v. Kettles, Crim. No. 3:16-00163-1, 2017 WL 2080181, at *2 (M.D. Tenn. May 15, 2017) (quoting Costello v. United States, 350 U.S. 359, 363 (1956)); see also United States v. Landham, 251 F.3d 1072, 1080 (6th Cir. 2001). Rule 12 allows a court to make preliminary findings of fact necessary to decide the questions of law presented by pre-trial motion only if those findings do not invade the province of the ultimate finder of fact. Jones, 542 F.2d at 665.

A plaintiff can challenge the constitutionality of a statute in two ways. "A facial challenge to a law's constitutionality is an effort to invalidate the law in each of its applications, to take the law off the books completely." Speet v. Schuette, 726 F.3d 867, 871 (6th Cir. 2013) (internal quotation marks omitted). In contrast, an as-applied challenge "argues that a law is unconstitutional as enforced against the [party] before the court." Id. at 872. This is an attack that implicates a court's jurisdiction to apply a statute. United States v. Lechner, 806 F.3d 869, 876 (6th Cir. 2015); United States v. Slone, 411 F.3d 643, 646 (6th Cir. 2005).

B.    Analysis

Beckham has moved to dismiss both counts of the indictment. The Court first considers Beckham's procedural ground for dismissal of the HCPA count, Gulf Oil Co. v. Bernard, 452 U.S. 89, 99 (1981) (holding that "prior to reaching any constitutional questions, federal courts must consider non-constitutional grounds for decision"), then considers his as-applied Commerce Clause challenge,[1] and then his arguments to dismiss the false statements count.

1.    Statutory Certification

Section 249(b)(1) of the United States Code requires that:

> No prosecution of any offense . . . may be undertaken by the United States, except under the certification in writing of the Attorney General, or a designee, that (A) the State does not have jurisdiction; (B) the State has requested that the Federal Government assume jurisdiction; (C) the verdict or sentence obtained pursuant to State charges left demonstratively unvindicated the Federal interest in eradicating bias-motivated violence; or (D) a prosecution by the United States is in the public interest and necessary to secure substantial justice.

---

[1] During briefing Beckham abandoned his facial constitutional challenge. (See Doc. No. 65 at 1.)

Beckham challenges the timeliness of the Government's certification. He contends that the HCPA count must be dismissed because the Government undertook his prosecution prior to securing the required § 249(b)(1) certification. (See Doc. Nos. 52 at 6-8; 65 at 7.)

The Government's argument that the Court may not review any issue concerning an HCPA certification is wrong. While the Sixth Circuit has not directly addressed review of an § 249(b)(1) certification, numerous courts of appeal have held that certifications under an analogous statutory requirement, 18 U.S.C. § 5032, may be reviewed for procedural defects including timeliness, as argued here by Beckham. See United States v. Smith, 178 F.3d 22, 26 n.2 (1st Cir. 1999); United States v. Jarrett, 133 F.3d 519, 537-39 (7th Cir. 1998); In re Sealed Case, 131 F.3d 208, 212-15 (D.C. Cir. 1997); United States v. Juvenile No. 1, 118 F.3d 298, 303-07 (5th Cir. 1997); Impounded (Juvenile R.G.), 117 F.3d 730, 733-36 (3d Cir. 1997); United States v. I.D.P., 102 F.3d 507, 510-13 (11th Cir. 1996); United States v. Doe, 49 F.3d 859 (2d Cir. 1995); United States v. Gonzalez-Cervantes, 668 F.2d 1073 (9th Cir. 1981). These courts and the Sixth Circuit all agree that under this analogous requirement certifications may not be reviewed for factual determinations or the "federal interest" in prosecutorial decisions. See United States v. Doe, 226 F.3d 672, 678 (6th Cir. 2000). The Government's argument misses this distinction. (Doc. No. 60 at 11-12.) In the three cases cited by the Government, the defendants sought substantive, not procedural, review of Department of Justice certifications. Furthermore, two district court cases cited by the Government acknowledge the appropriateness of procedural review. See United States v. Maybee, No. 3:11-CR-30006-002, 2013 WL 3930562, at *3 (W.D. Ark. July 30, 2013); United States v. Jenkins, 909 F. Supp. 2d 758, 775 (E.D. Ky. 2012). The Court has authority to review the Government's procedural compliance with § 249(b)(1).

The parties disagree about whether the Government's certification was timely. The Court starts with the plain language of § 249(b)(1) that creates the Attorney General's certification. Deutsche Bank Nat'l Tr. Co. v. Tucker, 621 F.3d 460, 462-63 (6th Cir. 2010) (citing United States v. Plavcak, 411 F.3d 655, 660 (6th Cir. 2005)). The dispositive words in § 249(b)(1) are "[n]o prosecution of any offense . . . may be undertaken by the United States" unless it is first properly certified by the Attorney General or his or her designee. If the statutory language is unambiguous, "the judicial inquiry is at an end, and the plain meaning of the text must be enforced." Id. at 661 (quotation omitted). The plain meaning of "undertake" is to "engage in," "set about to do," or "perform." See BLACK'S LAW DICTIONARY (online 2d ed.), available at https://thelawdictionary.org/undertake/ (last accessed June 29, 2019).

There can be no question that a prosecution is "commenced" only by means of a "formal charge, preliminary hearing, indictment, information, or arraignment." Rothgery v. Gillespie Cty., 554 U.S. 191, 198 (2008); McNeil v. Wisconsin, 501 U.S. 171, 175 (1991); United States v. Gouveia, 467 U.S. 180, 188 (1984); see also Turner v. United States, 885 F.3d 949, 951 (6th Cir. 2018) (en banc) (quoting Kirby v. Illinois, 406 U.S. 682, 688-89 (1972) (plurality opinion)). "This is not 'mere formalism,' but a recognition of the point at which 'the government has committed itself to prosecute,' 'the adverse positions of government and defendant have solidified,' and . . . the accused 'finds himself faced with the prosecutorial forces of organized society[.]'" Rothgery, 554 U.S. at 198 (quoting Kirby, 406 U.S. at 689). Identifying precisely when the Government begins a criminal prosecution has been particularly important to the Supreme Court because it is critical to the Sixth Amendment right to assistance of counsel in "all criminal prosecutions." Id.

As a matter of simple logic, the Government can only "engage in" or "perform" a prosecution that has, according to the Supreme Court, "commenced." Applying the plain meaning

of § 249(b)(1) here, the Government "undertook" Beckham's prosecution no earlier than when the Indictment was filed on April 4, 2018. The Acting Assistant Attorney General executed the § 249(b)(1) certification on March 27, 2018. (Doc. No. 65-1 at 2.) The certification was timely. That the Government presented an alleged eyewitness to the federal grand jury on February 22, 2018 (see Doc. No. 65-1 at 2) did not start the prosecution against Beckham because there was nothing that Beckham had to defend; only the Indictment issued by the grand jury told Beckham that his liberty was at issue. See, e.g., Rothgery, 554 U.S. at 206 (rejecting use of a prosecutor's preliminary involvement in a criminal case as a substitute measure for identifying the beginning of a prosecution). The Government's "target letter," sent to Beckham on March 28, 2019, one day after the certification was executed, supports the Court's conclusion. (Doc. No. 87-1.) In the letter, the Government informed Beckham that he needed to respond by April 2, 2018 or the Government would "begin the process of seeking criminal charges against [him.]" (Id. at 2.) This further highlights that after the certification date, but before the filing of the Indictment, the Government had not formally commenced Beckham's HCPA prosecution.

This is not a sufficient ground for dismissal of the HCPA count.

### 2. As-Applied Commerce Clause Challenge

"Congress possesses only the powers that are 'delegated' to it by the text of the Constitution." Lechner, 806 F.3d at 876; see also U.S. Const. amend. X.; James Madison, THE FEDERALIST NO. 45, pp. 292-293 (C. Rossiter ed. 1961) ("The powers delegated by the proposed Constitution to the federal government are few and defined."). The Commerce Clause contains one of these delegated powers. See U.S. Const. art. I, § 8, cl. 3 ("Congress shall have the power . . . to regulate Commerce with foreign Nations, and among the several States, and with the Indian

Tribes."). But the authority of Congress under the Commerce Clause is "subject to outer limits." Unites States v. Lopez, 541 U.S. 556-57 (1995).

Under modern Commerce Clause jurisprudence, Congress is limited to regulating three broad categories of interstate activity: (1) "the use of the channels of interstate commerce," (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce," and (3) "activities that substantially affect interstate commerce." Id. at 558-59. The Supreme Court applied this framework in United States v. Morrison, when it reviewed a statute regulating conduct substantially similar to that of the HCPA. 529 U.S. 598, 609 (2000). In Morrison, the court took up a challenge to certain provisions of the Violence Against Women Act, 42 U.S.C. § 13981 ("VAWA"), providing that "a person . . . who commits a crime of violence motivated by gender . . . shall be liable to the party injured." Id. The court held that, "given [the VAWA]'s focus was on gender motivated violence wherever it occurs (rather than violence directed at the instrumentalities of interstate commerce, interstate markets, or things or persons in interstate commerce)," the VAWA was properly analyzed under the third category of activities that substantially affect interstate commerce. Morrison, 529 U.S. at 609.

Section 249(a)(2) of the HCPA prohibits "caus[ing] bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, [or] attempt[ing] to cause bodily injury to any person, because of the actual or perceived religion, national origin, gender, sexual orientation, gender identity, or disability of any person." Like the VAWA, the HCPA is a law regulating bias-motivated violence rather than the channels (category one) or instrumentalities (category two) of interstate commerce. The HCPA, therefore, "like the VAWA in Morrison, falls under the [t]hird [c]ategory" of the Commerce Clause analysis. Jenkins, 909 F. Supp. 2d at 767. For the HCPA to be a valid exercise of Congressional power, it must

regulate an activity that substantially affects interstate commerce. Factors courts consider in making this determination include the economic nature of the prohibited activity; Congressional findings as to the effects of the prohibited activity on commerce; whether the statute contains a jurisdictional element; and whether the link between the prohibited activity and the effect on interstate commerce is too attenuated. Lopez, 514 U.S. at 561-62; Morrison, 529 U.S. at 611-12.

Bias-motivated violence is not "economic in nature" or "part of a larger regulatory scheme of economic activity" because it does not have a "commercial origin and consequence." Jenkins, 909 F. Supp. 2d at 768 (quoting Morrison, 529 U.S. at 611 (finding gender-related violence is not inherently economic in nature)). Congress, however, made explicit findings regarding the effect of bias-motivated violence on interstate commerce when it enacted the HCPA. Indeed, it is clear that "Congress paid close attention to the scope of its authority under the Commerce Clause when it enacted the [HCPA.]" United States v. Hill, --- F.3d ---, 2019 WL 2454848, at *3-4 (4th Cir. June 13, 2019) (citation omitted). As the Court of Appeals for the Fourth Circuit recently explained in Hill:

> The [HCPA's] substantive provisions are preceded by [C]ongressional findings regarding the prevalence and impact of violent hate crimes throughout the country, as well as Congress's intent to assist state and local efforts to combat such violence. Id. § 4702. Distinguishing hate crimes from other violent crimes – over which, Congress emphasized, States continue to retain exclusive prosecutorial authority – Congress concluded that violent hate crimes *substantially affect[ ] interstate commerce in many ways.* Id. § 4702(6). Among these effects, Congress explained that:
>
> > (A) The movement of members of targeted groups is impeded, and members of such groups are forced to move across State lines to escape the incidence or risk of such violence.
> > (B) Members of targeted groups are prevented from purchasing goods and services, obtaining or sustaining employment, or participating in other commercial activity.
> > (C) Perpetrators cross State lines to commit such violence.

> (D) Channels, facilities, and instrumentalities of interstate commerce are used to facilitate the commission of such violence.
> (E) Such violence is committed using articles that have traveled in interstate commerce.
> Id. Without question, the [HCPA] reflects Congress's carefully considered judgment that the scope of the statute complies with Congress's authority under the Commerce Clause, as that authority has been understood by the Supreme Court.

Hill, 2019 WL 2454848, at *4-5 (emphasis added). Thus, while bias-motivated violence is non-economic in nature, in the HCPA Congress was focused on the substantial underlying effects of violent hate crimes on interstate commerce.[2]

Critically, the HCPA contains an express jurisdictional element. "Incorporating a jurisdictional element into [an] offense has traditionally saved statutes from Commerce Clause challenges." United States v. Mullet, 868 F. Supp. 2d 618, 622-23 (N.D. Ohio 2012), reversed and remanded on other grounds sub nom., United States v. Miller, 767 F.3d 585, 589 (6th Cir. 2014). Indeed, the Sixth Circuit "regard[s] the presence of [ ] a jurisdictional element as the touchstone of valid congressional use of its Commerce Clause powers to regulate non-commercial activity." United States v. Coleman, 675 F.3d 615, 620 (6th Cir. 2012). As the Fourth Circuit recently observed in Hill, no "federal criminal statute including an interstate commerce jurisdictional element has been held to exceed Congress's authority under the Commerce Clause." Hill, 2019 WL 2454848, at *11.

A jurisdictional element, or "hook," fulfills its purpose because it expressly limits a law to the kind of activity that Congress is empowered to regulate. Jenkins, 909 F. Supp. 2d at 770. For

---

[2] Beckham notes that the dissenting judge in Hill criticized the Congressional findings concerning the HCPA as "nearly identical" to the findings rejected by the Supreme Court in Morrison. (Doc. No. 131 at 3 (citing Hill, 2019 WL 2454848, at *26 (Agee, J., dissenting)). One out-of-circuit, dissenting voice, however thoughtful, obviously does not dictate any particular outcome in a Sixth Circuit district court.

example, the presence of jurisdictional hooks enabled the Sixth Circuit to uphold certain criminal

provisions of the VAWA even after the Supreme Court in Morrison struck down the VAWA's

civil remedies provision that did not have a similar jurisdictional hook. See Coleman, 675 F.3d at

620 (citing United States v. Al-Zubaidy, 283 F.3d 804, 811 (6th Cir. 2002) and United States v.

Page, 167 F.3d 325, 325 (6th Cir. 1999) (en banc)). An express jurisdictional hook was also relied

upon by the Sixth Circuit and other courts of appeal in concluding that the federal Sex Offender

Registration and Notification Act is within Congress' Commerce Clause power "although not

directed at economic activity." Coleman, 675 F.3d at 621. Similarly, the Sixth Circuit has relied

on an express jurisdictional hook to sustain other criminal statutory schemes against Commerce

Clause challenges. See, e.g., United States v. Napier, 233 F.3d 394, 401 (6th Cir. 2000) (sustaining

federal statute prohibiting possession of firearms or ammunition by a person subject to a domestic

violence order); United States v. Chesney, 86 F.3d 564, 570 (6th Cir. 1996) (finding that the

presence of a jurisdictional element defeated defendant's challenge to a felon-in-possession of

firearm statute); see also United States v. Folen, 84 F.3d 1103, 1104 (8th Cir. 1996) (holding

express jurisdictional element was sufficient to ensure constitutionality of federal law prohibiting

felons from possessing explosives that have travelled in interstate commerce)

In this case, Beckham is charged with:

> (B) Circumstances described.—For purposes of subparagraph (A),
> the circumstances described in this subparagraph are that—
>> . . .
>
>> (iii) in connection with the conduct described in
>> subparagraph (A), the defendant employs a firearm,
>> dangerous weapon, explosive or incendiary device, or other
>> weapon that has traveled in interstate or foreign commerce
>> . . .

18 U.S.C. § 249(a)(2)(B)(iii). He does not challenge that the knife he is alleged to have used qualifies as a "dangerous weapon." Indeed, he could not seriously do so because courts have generally described knives as inherently dangerous weapons. See, e.g., United States v. Gardner, No. 97-1974, 1998 WL 786901, at *2 (6th Cir. Oct. 26, 1998) (citing use of a knife when affirming use of sentencing enhancement for possession of a "dangerous weapon" in the course of a robbery); United States v. Hedrick, 207 F. Supp. 2d 710, 714 (S.D. Ohio 2002) (noting that "a number of courts have held that the phrase 'dangerous weapon' may include objects other than guns and knives, both of which clearly constitute dangerous weapons," and observing that "a common sense definition of 'dangerous weapon' would include a knife with a three-inch blade"). The knife alleged in the Indictment satisfies the requirement of the jurisdictional hook that Beckham used a "dangerous weapon."

The jurisdictional hook also requires that the dangerous weapon traveled in interstate commerce. The Indictment generally alleges that this occurred but offers no details. In defending the motion, the Government has proffered a memorandum completed by FBI Special Agent J. Brandon Bushkell memorializing a November 15, 2017, interview of Jim McNair, an executive with KAI USA, regarding the knife. (Doc. No. 52-3.) In that interview, McNair said that the knife was allegedly manufactured in China to a U.S. company's design specifications; shipped from China to a U.S. company in Oregon; and subsequently shipped for sale in another U.S. state. (Id.) Whether or not the knife actually moved in interstate commerce is an ultimate issue for the jury to decide. See United States v. Mason, 993 F.Supp.2d 1308, 1317 (D. Oregon 2014) (denying as-applied HCPA challenge in part because questions regarding the alleged weapon required factual determinations by a jury). However, these allegations are sufficient, if established beyond a

reasonable doubt, to satisfy the "traveled in interstate commerce" requirement in the HCPA's jurisdictional hook.

Indeed, the allegations of Beckham's knife moving in interstate commerce arguably exceed those in the analogous case of United States v. Mullet. In that case, the indictment alleged that the defendants used scissors and hair clippers that had merely traveled into Ohio to carry out a hate crime, also invoking the jurisdictional hook of § 249(a)(2)(B)(iii). Mullet, 868 F. Supp. 2d at 623. In denying a similar as-applied challenge, the district court explained that the HCPA "requires the Government to allege and prove beyond a reasonable doubt a jurisdictional nexus, establishing an explicit connection between the prohibited conduct and interstate commerce" and "expressly criminalizes conduct in which the defendant used a weapon that traveled in interstate commerce or an instrumentality of interstate commerce." Id. The court concluded that "under well-established case law, the [HCPA] is constitutional . . . as applied here." See also Mason, 993 F. Supp. 2d at 1317 & n.5 (rejecting as-applied challenge to HCPA charge in part because the Government alleged that the defendant used a "serpentine belt tool" manufactured in China and used in both Washington and Oregon and noting that "[i]f the Government can prove that the weapon [the defendant] allegedly used traveled in interstate or foreign commerce, the jurisdictional element will be satisfied"); United States v. Roof, 252 F. Supp. 3d 469, 473 (D.S.C. 2017) (describing Mason as "rejecting a pretrial as-applied challenge to a § 249 claim because the Government alleged that the weapon used in the attack traveled in interstate commerce").

Here, the HCPA's jurisdictional hook may be satisfied at trial because the Government has alleged that that Beckham used a dangerous weapon that moved in interstate commerce. The jurisdictional hook serves to limit the HCPA's reach to crimes that affect interstate commerce. Had Beckham's knife allegedly been manufactured and used on a purely intrastate level, the

jurisdictional hook would perhaps not work to the Government's benefit. But Beckham is alleged to have attacked a man with a knife that was manufactured abroad and traveled in interstate commerce on at least two discrete occasions. Moreover, Congress has made clear that it considers hate crimes like the ones of which Beckham stands accused to have a substantial affect on interstate commerce, even if that affect may appear relatively minimal in an isolated case. Because the presumption of constitutionality is due more than "mere polite gesture[s]" from the Court, United States v. Five Gambling Devices, 346 U.S. 441, 449 (1953), those Congressional findings may not lightly be cast aside. On a motion to dismiss, Beckham has not made the required plain showing that the HCPA as-applied exceeds Congress' Commerce Clause power.[3] It will now be up to a jury to decide whether the Government is able to prove beyond a reasonable doubt that Beckham's used a knife that has moved in interstate commerce.

The HCPA count will not be dismissed.

Beckham's argument regarding Count Two, in which he is accused of making materially false statements to the FBI, is dependent on Beckham's prior argument that the HCPA charge was not "within the jurisdiction" of the Government. (Doc. No. 52 at 6.) Because the HCPA count will not be dismissed, his challenge to Count Two is moot. The Court notes, however, that this argument has also clearly been foreclosed by the Supreme Court. The Supreme Court has explicitly held that § 1001 may be used to prosecute individuals who lie to the FBI during a criminal investigation. United States v. Rodgers, 466 U.S. 475, 477 (1984). Further, in Bryson v. United

---

[3] The Government makes a very lengthy secondary argument throughout its briefing that the indictment may independently be sustained under Scarborough v. United States, 431 U.S. 563 (1977). Due to the Court's ruling under the Commerce Clause, it need not delve into this basis other than noting skepticism. Scarborough "was decided as a matter of statutory construction." Chesney, 86 F.3d at 571; see also Patton, 451 F.3d at 634 ("Scarborough decided only a question of statutory interpretation about a previous version of the felon-in-possession statute.").

States, the Supreme Court made clear that "a claim of unconstitutionality will not be heard to excuse a voluntary, deliberate and calculated course of fraud and deceit" under § 1001, and concluded that "none of the elements of proof necessary for [ ] conviction under § 1001" depends on the validity of the underlying statute providing federal jurisdiction. 396 U.S. 64, 68-70 (1969). Applying this precedent, a sister court rejected a challenge to a § 1001 false statements charge that was premised upon the Government's underlying investigation of an HCPA charge that a defendant alleged to be unconstitutional. See United States v. Mullet, Case No. 5:11-CR-594, 2015 WL 11711826, at *3 (N.D. Ohio Feb. 26, 2015). As in Mullet, here there was a federal statutory basis – the HCPA – for the inquiries of the FBI. Any subsequent constitutional challenge does not impact whether Beckham may be held criminally liable for making false statements to the FBI. Likewise, false statements cannot be justified based upon Beckham's a claim of lack of procedural compliance with the certification requirement of §249(b)(1), because a false statements charge does not require any particular outcome of the underlying investigation. See, e.g., United States v. Massey, 550 F.2d 300, 305 (5th Cir. 1977). Accordingly, the Court will not dismiss Count Two.

The motion to dismiss will be denied in its entirety.

III.     Motion to Suppress

Beckham moves to suppress statements that he made to FBI Special Agents Cromwell and Bushkell on March 12, 2018, before he was indicted by the federal grand jury. He contends that his Sixth Amendment right to counsel was violated because the agents interviewed him without the state attorney who represented him on state assault charges arising from the same incident. The FBI Special Agents were aware that Beckham was represented by counsel on that charge. (Doc. No. 65-1.) The Government argues that Beckham's Sixth Amendment rights were not implicated during the interview.

As discussed above, the Sixth Amendment right of the accused to counsel does not attach "until a prosecution is commenced." Rothgery, 554 U.S. at 198; Turner, 885 F.3d at 951. The right to counsel is "offense specific." Texas v. Cobb, 532 U.S. 162, 173 (2001). It "cannot be invoked once for all future prosecutions," McNeil v. Wisconsin, 501 U.S. 171, 175 (1991), or once for all "factually related offenses," Cobb, 532 U.S. at 168-69. For the Sixth Amendment right to counsel to attach to uncharged crimes, the federal and state sovereigns must have been seeking to prosecute Beckham for the "same offense." Turner, 885 F.3d at 954; see also United States v. Dudeck, 657 F.3d 424, 427 (6th Cir. 2011) ("[A] single transaction can give rise to distinct offenses under separate statutes[.]"). In determining what constitutes the "same offense," the Supreme Court applies the test in Blockburger v. United States, 284 U.S. 299 (1932).[4] Turner, 885 F.3d at 954; Cobb, 532 U.S. at 173. "The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." Turner, 885 F.3d at 954 (citing Blockburger, 284 U.S. at 304); see also United States v. Swafford, 512 F.3d 833, 844 (6th Cir. 2008).

Beckham was charged with aggravated assault under Tennessee law that provides a person commits assault who:

---

[4] Blockburger concerned the Fifth Amendment's Double Jeopardy Clause, but the Supreme Court has applied it to Sixth Amendment jurisprudence. See Cobb, 532 U.S. at 173 ("We see no constitutional difference between the meaning of the term "offense" in the contexts of double jeopardy and of the right to counsel. Accordingly, we hold that when the Sixth Amendment right to counsel attaches, it does encompass offenses that, even if not formally charged, would be considered the same offense under the Blockburger test."); Turner, 885 F.3d at 954.

(1) Intentionally, knowingly or recklessly causes bodily injury to another;
(2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury; or
(3) Intentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative.

Tenn. Code Ann. § 39-13-101. Further, aggravated assault occurs when a person:

(A) Intentionally or knowingly commits an assault as defined in § 39-13-101, and the assault:
(i) Results in serious bodily injury to another;
(ii) Results in the death of another;
(iii) Involved the use or display of a deadly weapon; or
(iv) Involved strangulation or attempted strangulation.

Tenn. Code Ann. 39-13-102(a)(1). The HCPA, on the other hand, prohibits "caus[ing] bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, [or] attempt[ing] to cause bodily injury to any person, because of the actual or perceived religion, national origin, gender, sexual orientation, gender identity, or disability of any person." 18 U.S.C. § 249(a)(2).

Under Blockburger, comparing the basic elements required for a conviction demonstrates that the aggravated assault charge and the HCPA charge are not the "same offense." This is apparent when the element of "bodily injury" is examined. To be convicted, the assault statute requires proof of "fear of bodily injury." The HCPA requires the Government to prove actual bodily injury or attempting to cause bodily injury. Further, the HCPA contains two additional statutory elements not present in Tennessee's assault statutes. Section 249(a)(2)(B)(iii) requires the Government to prove that Beckham's knife traveled in interstate commerce. And, under § 249(a)(2), the Government must prove that Beckham committed the assault "because of" the

16

victim's actual or perceived religion or national origin. See Miller, 787 F.3d at 591-93 (6th Cir. 2014) (holding that the "because of" element of a prosecution under the HCPA requires the government to prove but-for causation) (citing Burrage v. United States, 571 U.S. 204, 209-214 (2014)). Because the HCPA charge and Tennessee aggravated assault charge are not the "same offense" under Blockburger, Beckham's Sixth Amendment right to counsel was not implicated during the FBI interview.[5] See, e.g., Jenkins, 909 F.Supp.2d at 779 (holding that separate kidnapping and HCPA charges did not violate the Double Jeopardy Clause because, pursuant to Blockburger, the HCPA required proof of other elements).

Beckham skirts around this conclusion and, relying on United States v. Mills, 412 F.3d 325 (2d Cir. 2005), argues that the Tennessee aggravated assault charge and HCPA charge should be considered the "same offense" because the HCPA charge "encompasses" the elements of the state aggravated assault charge. This argument fails. First, it is wrong. The Tennessee assault statute is much broader than the HCPA. As explained above, the motive or intent is irrelevant under the assault statute, while the HCPA is quite focused on a specific intent. Second, in 2018, the Sixth Circuit, sitting *en banc* in United States v. Turner, disavowed Mills. Turner, 885 F.3d at 994-95. The Court of Appeals explained that Mills represented the "minority view" that "when a criminal defendant's conduct violates both state and federal law, the defendant nevertheless commits only one offense when the state and federal offenses contain the same essential elements." Id. at 955. The Sixth Circuit rejected that approach and instead endorsed "the majority view . . . that when a criminal defendant's conduct violates both state and federal law, that defendant commits two separate offenses, even when the state and federal offenses contain the same essential elements."

---

[5] The same conclusion holds for any misdemeanor assault charges based on Tennessee Code Annotated § 39-13-101.

Id. at 954 (citing United States v. Holness, 706 F.3d 579, 590-91 (4th Cir. 2013); United States v. Burgest, 519 F.3d 1307, 1310 (11th Cir. 2008); United States v. Coker, 433 F.3d 39, 43-45 (1st Cir. 2005); United States v. Avants, 278 F.3d 510, 517 (5th Cir. 2002)). It concluded that this result "more closely follows Supreme Court precedent" because "[u]sing the dual-sovereignty doctrine to determine the meaning of the term 'offense' in the double-jeopardy context but not in the Sixth Amendment right-to-counsel context would create a constitutional difference where the Supreme Court saw none." Id. at 955.

Turner draws strong support from controlling Supreme Court authority. That court has long held that two offenses are not the same for double jeopardy purposes if prosecuted by different sovereigns. See Heath v. Alabama, 474 U.S. 82, 92 (1985). And it has made clear that double jeopardy precedent is applicable to Sixth Amendment jurisprudence. Cobb, 532 U.S. at 173. Most importantly, in June of 2019, the Supreme Court affirmed the vitality of the dual-sovereignty doctrine in Gamble v. United States, thereby continuing to permit different sovereigns to pursue violations of their respective laws for the same conduct. Gamble v. United States, 139 S. Ct. 1960, 1964 (2019). In Gamble, state and federal charges for being a felon in possession of a firearm were examined. Id. The Supreme Court reaffirmed that "a crime under one sovereign's laws is not 'the same offence' as a crime under the laws of another sovereign." Id. It clarified that, under the dual-sovereignty doctrine, "a [s]tate may prosecute a defendant under state law even if the [f]ederal [g]overnment has prosecuted him for the same conduct under a federal statute. Or the reverse may happen, as it did here." Id. Thus, in Gamble, due to the involvement of separate sovereigns, double jeopardy was not implicated even though the two offenses would have constituted the same offense under the Blockburger test. Beckham's wager that the Supreme Court would overrule the separate

sovereign doctrine, adopt the Mills position, and undercut Turner, simply did not materialize in Gamble.

The other reasons Beckham offers for the Court to avoid Turner are all unpersuasive. First, the discussion in Turner is not mere *dicta* as Beckham suggests, but comprises an entire section of the court's opinion. See id. at 954-55. Second, it does not matter that the primary issue before the court in Turner concerned when the right to counsel attached for plea negotiations, because the Court of Appeals clearly indicated the key "same offense" question was also before it. See id. at 954 ("Turner also argues that even if the Sixth Amendment right to counsel does not ordinarily attach to preindictment plea negotiations, an indictment in a state prosecution triggers a criminal defendant's Sixth Amendment right to counsel for the purposes of forthcoming federal charges based on the same underlying conduct. . . . We address Turner's argument on the merits.") Third, Beckham argues that Turner may be downplayed because this case involves a "sham prosecution" between the state and federal sovereigns. However, he offers absolutely no corroboration for that naked allegation. The record reflects that the Government sought Beckham's HCPA indictment well after he was arrested by Tennessee. (Doc. Nos. 64-1, 87-1.) Finally, Beckham argues that Turner is inconsistent with the rejection of "silver-platter" evidentiary practices in Elkins v. United States, 364 U.S. 206 (1960). Not so. Elkins held that evidence obtained as the result of an unreasonable search and seizure by state officers, without involvement of federal officers, could not be introduced in evidence against a defendant over his timely objection in a federal criminal trial. Id. at 208. On March 12, 2018, FBI agents, not state officers, interviewed Beckham, and they were not collecting evidence for the use of another sovereign. Further, Tennessee entered a *nolle prosequi* resolution for its charges against Beckham.

In sum, Beckham's motion fails under Blockburger because the HCPA and Tennessee aggravated assault charges are not the "same offense." Even if there were no daylight between the state assault and federal HCPA offenses, and the HCPA charge "encompassed" the aggravated assault charge as Beckham suggests, the Government would have been acting permissibly as a separate sovereign under Turner and Gamble. Beckham's Sixth Amendment rights concerning the HCPA charge were not implicated when he was interviewed by the FBI agents.[6]

The motion to suppress will be denied.

IV.     Conclusion

For the foregoing reasons, Beckham's motion to dismiss and motion to suppress will be denied.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

---

[6] Because his right to counsel was never implicated, the Court need not consider whether Beckham waived it when he spoke with the FBI agents.